IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG

RANDALL CLAY FORD,

      Plaintiff,

v.                         CIVIL ACTION NO. 1:19-CV-192
                                  (KLEEH)

THE COUNTY COMMISSION OF MARION
COUNTY, JOHN BILLIE, in his official
and individual capacity, and JOHN DOE,
in his official and individual capacity,

      Defendants.

MEMORANDUM OPINION AND ORDER
**DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 70]**

      Pending before the Court is Plaintiff's Motion for Summary Judgment. For the reasons discussed below, the Court denies the motion.

## I. PROCEDURAL HISTORY

      On October 15, 2019, plaintiff Randall Clay Ford, II ("Ford") filed a complaint against Defendants County Commission of Marion County and John Billie (together, "Defendants") alleging three causes of action: (1) excessive use of force pursuant to 42 U.S.C. § 1983 against Defendant John Billie ("Defendant Billie"), (2) Monell liability against Defendant County Commission of Marion County ("County Commission") pursuant to 42 U.S.C. § 1983, and (3) intentional infliction of emotional distress against Defendant Billie. ECF No. 1. Ford requests compensatory damages, general

**MEMORANDUM OPINION AND ORDER**
**DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 70]**

damages, punitive damages, pre-judgment and post-judgment interest, costs and attorney fees under 42 U.S.C. § 1988, and such other further specific and general relief as may become apparent. Id. Defendants answered on December 17, 2019, and discovery ensued. Now, Ford and both Defendants move for summary judgment. Upon order of the Court, the parties also submitted supplemental briefings. This matter is fully briefed and ripe for review.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party must "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Id. Summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing First Nat'l Bank of Ariz. v. Cities Serv. Co.,

2

391 U.S. 253, 288 (1968)). This Court views the evidence in the light most favorable to Defendants, the non-moving parties, and draws any reasonable inferences in Defendants' favor. See Fed. R. Civ. P. 56(a); see Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).


## III. **FACTS**

At the summary judgment stage, the Court considers the facts in the light most favorable to the non-moving party. See Scott v. Harris, 550 U.S. 372, 378 (At summary judgment posture, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." (internal quotations and revisions omitted)). In October 2017, Ford was a 48-year-old man living in Harrison County, West Virginia. Compl., ECF No. 1, ¶ 4. On October 17, 2017, Ford was operating a Chevy Malibu vehicle with improper registration at approximately 12:30 a.m. when Mannington Police Officer Wesley Wheeler ("Wheeler") began following Ford. Id. at ¶¶ 29-30; ECF No. 96 at 2. Wheeler initiated his lights and attempted to pull over Ford in the parking lot of McDonald's in Mannington, West Virginia. Compl. at ¶ 30. Wheeler's reason for pursuing Ford was speeding, improper registration, and turning without a turn signal light into the closed McDonald's parking lot. Compl. at ¶ 30; ECF No. 96 at 3. Ford fled. Id. at ¶ 30.

**MEMORANDUM OPINION AND ORDER**
**DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 70]**

Ford drove on U.S. Route 250 south toward Shinnston, West Virginia. At this time, Wheeler coordinated with the Marion County Sheriff's Department ("MCSD"). Id. at ¶¶ 31-32. A speed of 85 mph was recorded during the chase, and that Ford had passed another vehicle; however, no other evidence of improper driving was recorded. ECF No. 96 at 3; ECF No. 71-3, Exhibit B, "2017 53622 Radio Traffic Combined." Defendant Billie and Deputy Lawson ("Lawson"), after Lawson obtained permission from Sergeant Love ("Sgt. Love"), were instructed to set up a staggered roadblock on Route 218 to attempt to stop or slow Ford to obtain a visual identification. Id. at ¶ 33; ECF No. 74-6, Lawson Dep. 22:1-23:24. Prior to the shooting of Ford, the fleeing suspect, on October 17, 2017, neither Lawson nor Defendant Billie knew the fleeing suspect's identity or the allegations pending against him. Lawson Dep. 25:25-26:12; ECF No. 74-7, Billie Dep. 24:3-25:3. However, Defendants' expert, Samuel Faulkner, maintains that the officers, including Defendant Billie, knew that Ford was the fleeing suspect. ECF No. 74-1, Faulkner Dep. 63:4-24.

Specifically, Lawson learned from his police training that the objective of a staggered roadblock is to slow down the vehicle, not to "block the road so they have no course but to crash into your vehicle," and that the officer configuring the roadblock would need to ensure a path of entry and escape. Lawson Dep. 13:3-13. The roadblock is designed with police cruisers as a tactic of

4

pursuit intervention: the officers are to position their police cruisers in the road in such a way that the vehicles effectuate a path of ingress and egress for the suspect's vehicle, and that the suspect must slow down in order to pass. Id. at 17:1-18:24. Lawson confirmed that no officer is to be in their police cruiser once the staggered roadblock is designed because of the risk that the suspect may use his vehicle as a weapon. Id. at 17:1-18:24. Lawson knew to be in a safe location once the roadblock was created, and to be "either on the side of a guardrail or far enough away from the vehicles" to remove himself from a potentially dangerous situation. Id. at 21:19-22:13. In the two-lane road, Lawson situated his police cruiser diagonally in the "oncoming" lane, essentially blocking the oncoming lane in its entirety, and positioned the cruiser so that the rear bumper was touching the center lane. Id. at 28:22-29:6. Defendant Billie's cruiser was parked behind Lawson's cruiser, "right on [and parallel to] the center line," and left "enough [distance between the two police cruisers] for a vehicle to get through." Id. at 29:3-12-30:1-10; Billie Dep. 27:3-5. Lawson testified that Ford was to travel in the only open lane of the road, which was the "oncoming lane of travel," and would require him to pass the staggered roadblock on his right. Lawson Dep. 30:5-10. Defendant Billie testified that the path of egress for Ford's vehicle was "between the cars." Billie Dep. 48:4-11. The roadblock was designed in such a way that

Ford "only had one path for his vehicle to go if he didn't want to wreck himself and [Lawson] knew John Billie was right there in that path." Lawson Dep. 35:3-36:1. The next time Lawson saw Defendant Billie, he was in the "ditch line off the side of the road." Lawson Dep. 34:17-19.

When Ford approached the staggered roadblock, he had limited time to observe and react, and also had limited visibility due to the flashing lights of cruisers in the road. Compl. ¶¶ 37-38. As Ford approached the roadblock, Defendant Billie was at the corner bumper of Lawson's vehicle, and Ford was driving approximately 40 miles per hour, or traveling 58.67 feet per second. Lawson Dep. 32:3-13; ECF No. 74-1, Faulkner Dep. 70:5-71:6. Ford slammed on his breaks and initiated the emergency break, but his breaks were in poor condition. Compl. ¶ 39. At no time did Ford see Defendant Billie while he was driving toward the roadblock, nor did he accelerate toward the roadblock location. Id. at ¶ 41, ECF No. 74-2, Ford Dep. 32:7-33:8.

Lawson discharged his weapon one time at a tire of Ford's vehicle as it passed him at the roadblock area. Lawson Dep. 34:2-5. Lawson also described the vicinity of Ford's vehicle to him as being "directly parallel" to him when he shot. Id. at 39:1-25. Defendant Billie testified that Ford had "passed Deputy Lawson and [] was accelerating toward [Defendant Billie]." Billie Dep. 44:10-20. Thereafter Defendant Billie ran alongside Lawson's police

cruiser, crossed the only lane of egress, "hit the embankment . . . [took] a step or two and [fell] into the bank. When [his] knee hit the bank, [he] drew [his] weapon and [he] spun and shot." Billie Dep. 44:10-20, 62:5-65:18; Faulkner Dep. 66:1-69:8. Defendant Billie discharged his firearm twice, shooting through Ford's driver's side window both times, striking Ford in the back twice, each bullet striking at the exact same location on his body, paralyzing him. Compl. at ¶¶ 46-47. Ford crashed his vehicle into a hillside to stop. Id. at ¶ 52.

Importantly, Lawson testified that one second of time passed between Lawson's first shot and Defendant Billie's two shots. Lawson's Dep. 38:20-25. Further, Lawson testified that he did not see anything in front of Ford's vehicle when he shot at Ford's tire, and that "[j]ust the road [was] there." Id. at 39:18-21. Lawson recalls that when he heard Defendant Billie's shots, Ford's vehicle was "directly parallel to where John Billie was at the time." Id. at 35:1-6. Defendant Billie did not estimate the distance between himself and the road or Ford's vehicle at the time he fired his weapon. Billie Dep. 46:11-15. Ford disputes that his vehicle was moving at the time he was shot. Ford Dep. 33:9-38:4. In fact, Ford testified that he approached the roadblock, began braking, and took off for the pathway created by the roadblock to avoid hitting the police cruisers. ECF No. 74-2, Ford Dep. 33:9-38:4. Ford's vehicle came to a stop on "the other side

of the roadblock," and then he was shot and paralyzed. Ford Dep. 33:9-38:4.

Ford alleges that the MCSD has a "custom, pattern, practice, and procedure of using unjustified and unreasonable excessive deadly force against individuals who are allegedly fleeing without anyone being in Imminent Danger" as defined by the use of force policy. Id. at ¶ 54. This policy states, in part: the use of lethal force can be used to prevent the escape of a suspect or prisoner whose freedom is reasonably believed to represent an imminent threat of serious bodily injury or death to the deputy; other law enforcement officers, or others. That policy also prohibits shooting at or from a moving vehicle absent exigent circumstances. ECF No. 71-22, MCSD Use of Force Policy, at section V(c)(2)(g).

MCSD has attempted to justify shooting at three citizens in four separate incidents, including this one, between December 2016 and October 2017 using the same false justification, and was on scene during a fourth shooting involving the City of Fairmont Police Department in 2016. Id. at ¶ 75. Ford recounts the July 25, 2017, and August 2, 2017, shootings of Philip Jontz Rhoades, and his own shooting on October 17, 2017, as events showing the pattern under Monell. Id. at ¶ 79.

Ford alleges three causes of action in the complaint:

1. Count I: 42 U.S.C. § 1983 - Excessive Use of Force

**MEMORANDUM OPINION AND ORDER**
**DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 70]**

2. Count II: 42 U.S.C. § 1983 - Monell Liability (County Commission of Marion County)

3. Count III: Intentional Infliction of Emotional Distress

### IV.  DISCUSSION

Ford moves for summary judgment on the following grounds: (1) Ford's claims under 42 U.S.C. 1983 for excessive force should be granted as Defendant John Billie ("Billie") used excessive force against Ford; and (2) Ford's Monell claims demonstrate a pattern and practice by the Marion County Sheriff's Department of violating Ford's, and others', constitutional rights. The Court will address each argument in turn.

### A. Count I: 42 U.S.C. § 1983 - Excessive Use of Force

#### 1.  Qualified Immunity

Qualified immunity can be afforded to government officials for discretionary acts taken in their official capacity. The protection extends to "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). An officer, generally, is protected by qualified immunity if his "actions could reasonably have been thought consistent with the rights . . . alleged to have [been] violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987). The test to determine whether an officer is entitled to qualified immunity is two-fold: (1) taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's

**MEMORANDUM OPINION AND ORDER**
**DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 70]**

conduct violated a constitutional right, and (2) was that right clearly established such that a reasonable person would have known? Siegert v. Gilley, 500 U.S. 226, 232 (1991). In determining whether a right is clearly established, the "dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Brosseau v. Haugen, 543 U.S. 194, 198-99 (2004) (citing Anderson, 493 U.S. at 201-202). The Court can address either prong first. Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).

### 2.   Excessive Force

"[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Tennessee v. Garner, 471 U.S. 1, 7 (1985). "The determination whether a reasonable person in the officer's position would have known that his conduct would violate the right at issue must be made . . . in light of any exigencies of time and circumstances that reasonably may have affected the officer's perceptions." Pritchett v. Alford, 973 F.2d 307, 312-13 (4th Cir. 1992). Under the Fourth Amendment's "reasonableness" analysis, force is not excessive if it is objectively reasonable under the circumstances facing the officer, without regard to his underlying intent. Graham v. Conner, 490 U.S. 386, 397 (1989).

**MEMORANDUM OPINION AND ORDER**
**DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 70]**

The "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 396–97. The Supreme Court has written the following about the reasonableness of deadly force:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

Garner, 471 U.S. at 11.

Deadly force "may not be used unless necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Id. at 1. This assessment occurs at the moment that force is used. Elliott v. Leavitt, 99 F.3d 640, 643 (4th Cir. 1996) (writing that "conduct prior to that moment is not relevant in determining whether an officer used reasonable force"). The Supreme Court has held that police may not use deadly force against an unarmed, non-dangerous, fleeing suspect. Id. Thus, for purposes of qualified immunity analysis, it is clearly

11

established that using deadly force in such a situation is unlawful.

Here, in order for the Court to grant summary judgment to Ford as to Count I: 42 U.S.C. § 1983 - Excessive Use of Force, it would need to find as a matter of law that Defendant Billie's conduct was unreasonable given the circumstances. Those circumstances, however, are disputed. Viewing the evidence in the light most favorable to the non-movant (Defendants), Ford's vehicle was either in front of or immediately adjacent to Defendant Billie when Defendant Billie fired shots at Ford and paralyzed him. At no time has Defendant Billie provided an estimate as to the distance between he or Lawson to Ford's vehicle at the time of either shooting. Billie Dep. 36:1-37:22. It is possible for a reasonable jury to find that such placement of Ford's vehicle and Defendant Billie was possible because Defendant Billie's two gun shots entered Ford's driver side window as Ford's car was passing through a staggered roadblock created by the officers, and struck Ford under his left arm, causing the spinal cord injury that resulted in his paralysis. The vehicle's placement in relation to Defendant Billie when he fired the shots could negate the theory that the vehicle was used as a weapon or posed a threat, which could make Defendant Billie's conduct potentially unreasonable. However, a reasonable juror could also find that Defendant Billie's conduct was reasonable because Ford's vehicle was immediately

adjacent to Defendant Billie when he fired the shots, making Ford an immediate threat to Defendant Billie. It is clearly established that, via Tennessee v. Garner and its progeny, an officer's use of deadly force against a non-threatening, non-dangerous individual is an unlawful seizure in violation of the Fourth Amendment.

The parties rely heavily on Waterman v. Batton, 393 F.3d 471 (4th Cir. 2005). In Waterman, police followed the defendant, Waterman, on a high-speed chase just prior to shooting him. Over radio traffic, one officer reported that Waterman "just tried to run [him] off the road . . . he's trying to take us off the road." Id. at 474. The Court of Appeals for the Fourth Circuit found in Waterman that police officers were entitled to qualified immunity based on Waterman's vehicle's "lurching" toward them, along with other factors, because at the time the vehicle "lurched forward, the officers were forced to immediately decide whether Waterman was attempting to assault the officers ahead of him or whether he intended only to drive by them, leaving them unharmed." Id. at 477.

Plaintiff urges this Court to take Waterman to mean the use of force in any case where a vehicle has **passed** law enforcement is per se unreasonable.  Flowing from that, Plaintiff further argues the fact the bullets entered Ford's vehicle through the driver-side window ends the inquiry and makes the excessive force claim

subject to an award of summary judgment. However, <u>Waterman</u> is not as conclusive on the point as Plaintiff argues. "[T]he closeness of the officers to the projected path of Waterman's vehicle is crucial to our conclusion that deadly force was justified." <u>Id</u>. at 479 (noting agreement with the "general proposition" the position of the person allegedly in danger relative to the path of the vehicle is "important"). The Fourth Circuit went on to cite <u>Scott v. Edinburg</u>, 346 F.3d 752 (7th Cir. 2003) as "instructive." <u>Id</u>. <u>Scott</u>, again, cited as instructive, focused on not only the direct path of the vehicle but individuals who were "in the **immediate vicinity** of the path." <u>Scott</u>, 346 F.3d at 759.

This Court does not disagree that if there was no dispute that Ford's vehicle was lurching toward police, that fact would help to establish qualified immunity for Defendant Billie. However, at summary judgment stage, viewing the facts in the light most favorable to the non-moving party, the Court cannot find the undisputed facts show that the vehicle was not moving toward Defendant Billie or that Defendant Billie was not "in the immediate vicinity of the path" of the vehicle. Instead, the facts presented to the Court include testimony from Defendant Billie that Ford's vehicle had "passed Deputy Lawson and [] was accelerating toward [Defendant Billie]" which essentially required Defendant Billie to cross the lane of egress, "hit the embankment," take "a step or two and [fall] into the bank. Billie Dep. 44:10-20. Thereafter,

Defendant Billie drew his weapon, spun, and shot twice. Billie Dep. 44:10-20. Defendants allege this series of events occurred while Ford's vehicle was moving 40 mph, or 58.67 feet per second through the roadblock.

Lawson's testimony paints a different picture. He recalls that only one second of time passed between Lawson's first shot and Defendant Billie's two shots, and that Lawson did not see anything in front of Ford's vehicle when he shot at Ford's tire, but simply that "[j]ust the road [was] there." Lawson Dep. 38:20-25-39:18-21. Finally, Ford maintains that he only saw the cruiser's flashing lights and never saw Lawson or Defendant Billie while he was driving toward the roadblock, nor did he accelerate toward the roadblock location. Compl. at ¶ 41, Ford Dep. 32:7-33:8.

Because this Court cannot "ignore[] discrepancies among the officers' accounts," or sworn testimony from the plaintiff, it must conclude that a reasonable jury could find that Defendant Billie used reasonable force. See Estate of Jones by Jones v. City of Martinsburg, West Virginia, 961 F.3d 661, 666 (4th Cir. 2020) (internal quotation and citation omitted). Importantly, and instrumental in this Court's decision, evidence exists that could lead a reasonable jury to find that Ford's vehicle was moving toward Defendant Billie because Ford's vehicle had "passed Deputy Lawson and [] was accelerating toward [Defendant Billie]," which lead to the remaining events. Billie Dep. 44:10-20.  Likewise,

sufficient questions of fact exist as to Defendant Billie's precise location vis-à-vis Ford's vehicle at the time of the shots such that this Court cannot determine, at summary judgment stage, whether Defendant Billie was either in the projected path or immediate vicinity of the path of the vehicle. See Waterman, 393 F.3d at 479-80.

For those reasons, the Court finds that there is sufficient evidence for a jury to find that Defendant Billie's conduct was objectively reasonable. The Court is required to conduct a "reasonableness" analysis - one of objective reasonableness - as to whether Defendant Billie used excessive force. See Elliott, 99 F.3d at 643 (the assessment of whether the suspect is a threat is made at the moment when force is used); see also Waterman, 393 F.3d at 481 (stating that "events should be reviewed outside the context of the conduct that precipitated the seizure" and that deadly force, even if justified at the beginning of an encounter, can be eliminated "even seconds later" if the threat is eliminated). The record before the Court does not support a finding that there is no genuine issue of material fact – in fact, the Court finds the opposite exists, and therefore certainly cannot award judgment as a matter of law to Ford. Take, for example, Samuel Faulkner's deposition, where Plaintiff's counsel attempted to surmise a distance between all persons and vehicles present at the roadblock on October 17, 2017, and the length of the encounter

based upon the testimony and mathematical equation. See Faulkner Dep. 63:4-77:25. However, there is more missing information than there is present. While, according to Defendant Billie, Lawson's estimated placement at the time he shot at Ford's passing vehicle is 50-60 feet in front of Lawson's parked police cruiser, no witness has testified as to where Ford's vehicle was during Lawson's or Defendant Billie's shots – other than Lawson's testimony that it was "directly parallel" to them – and there is even less evidence regarding Defendant Billie's placement. Under these circumstances the Court is left with little doubt that a genuine issue of material fact exists here.

There are differing accounts as to whether Lawson and Defendant Billie knew Ford was the fleeing suspect. While Ford may have been fleeing a police officer, there is a genuine issue of material fact as to whether either Lawson or Defendant Billie were in danger, because, gleaning from the record and Ford's resulting injury, the shots fired by Defendant Billie were fired as Ford's vehicle was either next to or immediately adjacent to Defendant Billie. Notably, Defendants suggest that Ford was driving his vehicle at the officers and therefore using his vehicle as a weapon. Because the record before the Court contains a great deal of evidence that could lead a reasonable jury to conclude that this fact is true, and that Defendant Billie used the reasonable force necessary to prevent Ford's escape Defendant Billie had

**MEMORANDUM OPINION AND ORDER**
**DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 70]**

probable cause to believe that Ford posed a significant threat of death or serious physical injury to Defendant Billie or others, the Court finds that a genuine issue of material facts exists when reviewing the record in the light most favorable to Defendants, and **DENIES the** motion for summary judgment as to this claim.

### B. Count II: 42 U.S.C. § 1983 - <u>Monell</u> Liability (County Commission of Marion County)

Ford argues that officers have violated the Marion County Sheriff's Department Use of Force Policy numerous times, and have exhibited a lack of training thereunder, which led to the shooting on October 17, 2017. A municipality is liable under § 1983 if it follows a custom, policy, or practice by which local officials violate a plaintiff's constitutional rights. <u>Monell v. Dep't of Social Servs. of City of New York</u>, 436 U.S. 658, 694 (1978). "[T]he substantive requirements for establishing municipal liability for police misconduct are stringent indeed. The critical Supreme Court decisions have imposed this stringency in a deliberate effort to avoid the indirect or inadvertent imposition of forms of vicarious liability rejected in <u>Monell</u>." <u>Spell v. McDaniel</u>, 824 F.2d 1380, 1391 (4th Cir. 1987). Courts have required plaintiffs to demonstrate "persistent and widespread . . . practices of [municipal] officials," along with the "duration and frequency" – which indicate that policymakers (1) had actual or constructive

**MEMORANDUM OPINION AND ORDER**
**DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 70]**

knowledge of the conduct, and (2) failed to correct it due to their "deliberate indifference." Spell, 824 F.2d at 1386–91. Sporadic or isolated violations of rights will not give rise to Monell liability; only "widespread or flagrant" violations will. Owens v. Baltimore City State's Attorneys Office, 767 F.3d 379, 402–03 (4th Cir. 2014) (citing Spell, 824 F.2d at 1387).

Municipal liability results only when policy or custom is "(1) fairly attributable to the municipality as its 'own,' and is (2) the 'moving force' behind the particular constitutional violation." Spell, 924 F.2d at 1386–87 (citations omitted). "Custom and usage" require a showing that the "duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." Id. at 1387. The actual knowledge can be established by reports or discussions. Id. Constructive knowledge may be shown by the practices being "so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of them." Id. In other words, the "deliberate indifference" standard under Spell requires that a municipality either knew or should have known about the deficiency in training, so it could remedy that deficiency. Estate of Jones by Jones v. City of Martinsburg, West Virginia, 961 F.3d 661, 672 (4th Cir. 2020). Such a developed "custom or usage" may then become the basis of municipal liability,

but only if its continued existence can be laid to the fault of municipal policymakers, and a sufficient causal connection between the "municipal custom and usage" and the specific violation can then be established. Id. at 1390.

To attach liability to a municipality for failure to train under Monell, the plaintiff must show the "deliberate indifference" on the part of the municipality, keeping in mind that "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Connick v. Thompson, 563 U.S. 51, 62 (2011). As the United States District Court for the Eastern District of New York explained,

> the mere fact that a number of lawsuits have been filed, without any information as to whether the suits are meritorious or spurious, or alternatively, any evidence that the municipality ignored such complaints such that it constituted deliberate indifference to any potential problem of excessive force, does not assist a fact-finder in determining whether the [municipality] actually has a historical problem of its police officers using unconstitutionally excessive force in the performance of their duties.

Ostroski v. Town of Southold, 443 F.Supp.2d 325, 346 (E.D.N.Y. 2006). "A passing reference to an isolated lawsuit in which no liability was established or admitted is hardly sufficient to support a failure-to-train Monell claim." Frye v. Lincoln County

**MEMORANDUM OPINION AND ORDER**
**DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 70]**

Commission, No. 2:20-cv-00403, 2021 WL 243864, *1, *8 (S.D.W. Va. Jan. 25, 2021).

In <u>Carter v. Morris</u>, 164 F.3d 215 (4th Cir. 1999), the plaintiff brought suit against the Danville Police Department. The Fourth Circuit found that the plaintiff's allegations were insufficient to establish <u>Monell</u> liability. The court boiled down plaintiff's cited incidents to two instances — in addition to the instance at issue in the case — of "even arguably unlawful arrests" or unreasonable searches and seizures by the Danville Police Department. <u>Id.</u> at 219. The court referred to this evidence as a "meager history of isolated incidents" that does not reach the required "widespread and permanent" practice necessary to establish a municipal custom. <u>Id.</u> at 220. The court also noted that the plaintiff showed no relevant incident prior to her own case of which the City could have had knowledge and could have acquiesced. <u>Id.</u>

However, Courts have also held that <u>Monell</u> liability can attach to municipalities when the policy and custom is based upon a single incident. See <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469 (1986). The Court was presented with the following question: "[w]hether, and in what circumstances, a decision by municipal policymakers on a single occasion may satisfy this requirement," to which it answered:

**MEMORANDUM OPINION AND ORDER**
**DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 70]**

> [I]t is plain that municipal liability may be imposed
> for a single decision by municipal policymakers under
> appropriate circumstances. No one has ever doubted, for
> instance, that a municipality may be liable under §
> 1983 for a single decision by its properly constituted
> legislative body—whether or not that body had taken
> similar action in the past or intended to do so in the
> future—because even a single decision by such a body
> unquestionably constitutes an act of official government
> policy.

Id. at 471, 480.

Here, Ford has not alleged that the MCSD has promulgated any formal unconstitutional policy. Instead, Ford argues that the MCSD "has a custom, pattern, practice, and/or procedure of using Excessive Force against individuals who are allegedly fleeing without anyone being in Imminent Danger . . . and without the existence of exigent circumstances." Compl. at ¶ 74. Ford claims that the MCSD has a custom, pattern, practice, and procedure of falsely claiming an imminent threat exists in order to justify the unlawful uses of excessive force. Id. ¶¶ 74-75.

Ford points to four (4) total shootings in support of attaching Monell liability to Defendant County Commission of Marion County: (1) July 25, 2017 shooting by Deputy Love at Philip Jontz Rhoades; (2) August 2, 2017 shooting by Deputy Forsyth at Philip Jontz Rhoades, killing him; (3) the instant October 17, 2017, shooting by Defendant Billie at Ford, paralyzing him; and

(4) a 2016 shooting involving the City of Fairmont Police Department at which the MCSD was present.[1] Id. ¶¶ 75-79.

Ford also argues that Defendant MCSD fails to train its deputies on its "Use of Force" policy. See Compl. ¶¶ 21-23; Pl's Memorandum, ECF No. 71 at 12-17. The extent of Ford's argument on this issue is two-fold: (1) because deputies are unable to articulate what is contained in the policy during their depositions, it follows that MCSD fails to train its officers on its use of force policy; and (2) the only training officers receive on the "policy is that they are provided a copy of the same and told to ask if they have any questions." Pl's Memorandum at 12-17.

MCSD's Use of Force Policy defines "Excessive Force" as "force used greater than that which is reasonably necessary to compel compliance given the circumstances or inappropriate to the circumstances to accomplish a legal purpose. When any degree of force is utilized as summary punishment or for vengeance. Excessive force is NEVER authorized." Use of Force Policy, ECF No. 1-4. The policy further describes when officers are permitted to use lethal force. Pertinent to this case, officers may use lethal force

> when the deputy reasonably believes that it is necessary to: a) [p]rotect themselves or others from what they believe to be an imminent threat of serious bodily injury

---

[1] According to the Defendants' Motion for Summary Judgment, the 2016 shooting occurred in December and involved Randy Cumberledge, who was killed. ECF No. 74 at 25.

or death to include but not limited to: i) attempts to render the deputy unconscious; ii) grabbing for the deputy's firearm; iii) blows or attempted blows to the deputy's vital organs or head; iv) stabbing, shooting or <u>any other action that would create a likelihood of causing the deputy or another serious injury or death</u>.

<u>Id.</u> (emphasis added). Lethal force may also be deployed "[t]o prevent the escape of a suspect or prisoner whose freedom is reasonably believed to represent an imminent threat of serious bodily injury or death to the deputy, other law enforcement officers, or others." <u>Id.</u>

Defendant County Commission of Marion County ("County Commission") argues that Ford's <u>Monell</u> claim fails as there has been no violation of any constitutional rights and there has been no evidence presented by which a reasonable juror could find the County Commission had a custom of violating constitutional rights. The County Commission further argues that the four (4) alleged incidents are too few to rise to the level of "persistent and widespread" as required by <u>Monell</u>.

The Court disagrees with the County Commission: Here, Ford has set forth a satisfactory custom or a persistent and widespread practice that a reasonable juror could conclude violated Ford's rights[2]; however, Ford has failed to demonstrate to this Court no

---

[2] As noted in more detail than necessary here, the Court, in its Order denying Defendants' Motion for Summary Judgment on the same claim, found the alleged constitutional deprivations sufficiently

MEMORANDUM OPINION AND ORDER
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 70]

genuine issue of material fact exists and that Ford should be granted judgment as a matter of law on the Monell claim. For this reason, Ford's motion is denied as to this issue.

In his Response, Ford relies on the following events to support the Monell claim:

- The shooting during a July 25, 2017 pursuit (MCSD police fired shots at Philip Jontz Rhoades and missed) (the "July 25 Shooting");

- The shooting on August 2, 2017 (MCSD police fired shots at Philip Jontz Rhoades and killed him) (the "August 2 Shooting");

- The shooting at Ford's moving vehicle as it transgressed the staggered roadblock on October 17, 2017 (MCSD police fired one shot at Ford and missed); and

- The shooting at Ford's moving vehicle as it transgressed the staggered roadblock on October 17, 2017 (MCSD police fired two shots at Ford through his driver's side window, both gun shots entering his left side of his body, resulting in paralysis). ECF No. 96.

Ford has failed to meet the stringent requirements under Rule 56(c) on the Monell claim. Ford "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

"flagrant" and factual disputes sufficiently material, at least under the applicable Rule 56 standards, to require jury resolution.

affidavits, if any,' which he believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Because there remains genuine issues of fact necessitating jury resolutions, this Court must deny Ford's motion.

Importantly, the alleged policy or custom must be the "moving force" behind the constitutional violation at issue. Also importantly, the deliberate indifference standard implicated here requires that a municipality either knew or should have known about the deficiency, so it could remedy that deficiency. See Estate of Jones by Jones v. City of Martinsburg, West Virginia, 961 F.3d 661, 672 (4th Cir. 2020). Because Ford left much to be inferred from the pleadings, deposition transcripts, and filings, the Court finds that there remains a genuine issue of material fact as to whether MCSD in fact failed to train its officers and whether the County Commission knew or should have known that such deficiency existed. See Fed. R. Civ. P. 56(a). This Court views the evidence in the light most favorable to Defendants, the non-moving parties, and draws any reasonable inferences in Defendants' favor.

Ford argues that the first two incidents, the July 25 Shooting and the August 2 Shooting, prove the existence of a policy or custom. While this Court found in its Order Denying Defendants' Motion for Summary Judgment that a reasonable jury could conclude that two incidents involving the same person — Philip Rhoades — is

enough to support a "widespread and permanent" practice by a municipality, especially because a single occasion may satisfy this requirement, Ford has failed to show there is no genuine issue of material fact as to the <u>Monell</u> claim. Further, while it has not been adjudicated that Rhoades's constitutional rights were violated during the July 25 Shooting, much less violated in the same manner as Ford's were, allegedly, here, the instant matter is scheduled for trial merely one week after the Rhoades trial is set to begin. A reasonable jury could contribute the shootings at Ford by Lawson and Defendant Billie on October 17, 2017, to a persistent and widespread practice under <u>Monell</u>. A reasonable jury could also contribute the shootings at Rhoades by MCSD police on July 25, 2017 and August 2, 2017, to a persistent and widespread practice under <u>Monell</u> once the claims are adjudicated. The issue before the Court now is whether Ford has demonstrated the absence of a genuine issue of material fact, and he has not. The record before the Court is replete with reasonable factual inferences that it must draw in Defendants' favor. The Court, therefore, denies the motion for summary judgment as to Count II.

## V. <u>CONCLUSION</u>

For the reasons discussed above, the Court **ORDERS** that Plaintiff's Motion for Summary Judgment is **DENIED** as to Count I and **DENIED** as to Count II.

**MEMORANDUM OPINION AND ORDER**
**DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 70]**

It is so **ORDERED.**

The Clerk is directed to transmit copies of this Order to counsel of record.

DATED: April 8, 2021

/s/ Thomas S. Kleeh
THOMAS S. KLEEH
UNITED STATES DISTRICT JUDGE