IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG

RANDALL CLAY FORD,

       Plaintiff,

v.                         CIVIL ACTION NO. 1:19-CV-192
                                (KLEEH)

THE COUNTY COMMISSION OF MARION
COUNTY, JOHN BILLIE, in his official
and individual capacity, and JOHN DOE,
in his official and individual capacity,

       Defendants.

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 73]

Pending before the Court is Defendants' Motion for Summary Judgment. For the reasons discussed below, the Court denies the motion.

## I. PROCEDURAL HISTORY

On October 15, 2019, plaintiff Randall Clay Ford, II ("Ford") filed a complaint against Defendants County Commission of Marion County and John Billie (together, "Defendants") alleging three causes of action: (1) excessive use of force pursuant to 42 U.S.C. § 1983 against Defendant John Billie ("Defendant Billie"), (2) Monell liability against Defendant County Commission of Marion County ("County Commission") pursuant to 42 U.S.C. § 1983, and (3) intentional infliction of emotional distress against Defendant Billie. ECF No. 1. Ford requests compensatory damages, general

damages, punitive damages, pre-judgment and post-judgment interest, costs and attorney fees under 42 U.S.C. § 1988, and such other further specific and general relief as may become apparent. Id. Defendants answered on December 17, 2019, and discovery ensued. Now, Ford and both Defendants move for summary judgment. Upon order of the Court, the parties also submitted supplemental briefings. This matter is fully briefed and ripe for review.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party must "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Id. Summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing First Nat'l Bank of Ariz. v. Cities Serv. Co.,

**MEMORANDUM OPINION AND ORDER**
**DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 73]**

391 U.S. 253, 288 (1968)). This Court views the evidence in the light most favorable to Ford, the non-moving party, and draws any reasonable inferences in Ford's favor. See Fed. R. Civ. P. 56(a); see Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

The Court is mindful that Defendants' advance a qualified immunity defense here and the significance of that issue particularly at summary judgment stage.

> Qualified immunity is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Thus, we have held that an order denying qualified immunity is immediately appealable even though it is interlocutory; otherwise, it would be "effectively unreviewable." *Id.*, at 527, 105 S.Ct. 2806. Further, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam).

Scott v. Harris, 550 U.S. 372, 376 n.2 (2007). Regardless, the standards established by Rule 56 remain and must be satisfied if the Court is to grant summary judgment even on qualified immunity grounds.

MEMORANDUM OPINION AND ORDER
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 73]

### III. <u>FACTS</u>

At the summary judgment stage, the Court considers the facts in the light most favorable to the non-moving party.  <u>See</u> <u>id</u>. at 378 (At summary judgment posture, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." (internal quotations and revisions omitted)); <u>see also</u> <u>Rhoades v. County Commission of Marion</u> County, Civil Action No. 1:18-CV-186, 2020 WL 807528, at *1 (N.D.W. Va. Feb. 18, 2020).  In October 2017, Ford was a 48-year-old man living in Harrison County, West Virginia. Compl., ECF No. 1, ¶ 4. On October 17, 2017, Ford was operating a Chevy Malibu vehicle with improper registration at approximately 12:30 a.m. when Mannington Police Officer Wesley Wheeler ("Wheeler") began following Ford. <u>Id.</u> at ¶¶ 29-30; ECF No. 96 at 2. Wheeler initiated his lights and attempted to pull over Ford in the parking lot of McDonald's in Mannington, West Virginia. Compl. at ¶ 30. Wheeler's reason for pursuing Ford was speeding, improper registration, and turning without a turn signal light into the closed McDonald's parking lot. Compl. at ¶ 30; ECF No. 96 at 3. Ford fled. <u>Id.</u> at ¶ 30.

Ford drove on U.S. Route 250 south toward Shinnston, West Virginia. At this time, Wheeler coordinated with the Marion County Sheriff's Department ("MCSD"). Compl. at ¶¶ 31-32. A speed of 85 mph was recorded during the chase, and that Ford had passed another

vehicle; however, no other evidence of improper driving was recorded. ECF No. 96 at 3; ECF No. 71-3, Exhibit B, "2017 53622 Radio Traffic Combined." Defendant Billie and Deputy Lawson ("Lawson"), after Lawson obtained permission from Sergeant Love ("Sgt. Love"), were instructed to set up a staggered roadblock on Route 218 to attempt to stop or slow Ford to obtain a visual identification. Compl. at ¶ 33; ECF No. 74-6, Lawson Dep. 22:1-23:24. Prior to the shooting of Ford, the fleeing suspect, on October 17, 2017, neither Lawson nor Defendant Billie knew the fleeing suspect's identity or the allegations pending against him. Lawson Dep. 25:25-26:12; ECF No. 74-7, Billie Dep. 24:3-25:3.

Specifically, Lawson learned from his police training that the objective of a staggered roadblock is to slow down the vehicle, not to "block the road so they have no course but to crash into your vehicle," and that the officer configuring the roadblock would need to ensure a path of entry and escape. Lawson Dep. 13:3-13. The roadblock is designed with police cruisers as a tactic of pursuit intervention: the officers are to position their police cruisers in the road in such a way that the vehicles effectuate a path of ingress and egress for the suspect's vehicle, and that the suspect must slow down in order to pass. Id. at 17:1-18:24. Lawson confirmed that no officer is to be in their police cruiser once the staggered roadblock is designed because of the risk that the suspect may use his vehicle as a weapon. Id. at 17:1-18:24. Lawson

knew to be in a safe location once the roadblock was created, and to be "either on the side of a guardrail or far enough away from the vehicles" to remove himself from a potentially dangerous situation. Id. at 21:19-22:13. Lawson situated his police cruiser diagonally in the "oncoming" lane, with the rear bumper touching the center lane. Id. at 28:22-29:6. Defendant Billie's cruiser was parked behind Lawson's cruiser, "right on the center line" and left "enough [distance between the two police cruisers] for a vehicle to get through." Id. at 29:3-12-30:1-10, Billie Dep. 27:3-5. Lawson testified that Ford was to travel in the open lane of the staggered roadblock, which was the "oncoming lane of travel." Lawson Dep. 30:5-10. Defendant Billie testified that the path of egress for Ford's vehicle was "between the cars." Billie Dep. 48:4-11. The roadblock was designed in such a way that Ford "only had one path for his vehicle to go if he didn't want to wreck himself and [Lawson] knew John Billie was right there in that path." Lawson Dep. 35:3-36:1. The next time Lawson saw Defendant Billie, he was in the "ditch line off the side of the road." Lawson Dep. 34:17-19.

When Ford approached the staggered roadblock, he had limited time to observe and react, and also had limited visibility due to the flashing lights of cruisers in the road. Compl. ¶¶ 37-38. As Ford approached the roadblock, Defendant Billie was at the corner bumper of Lawson's vehicle, and Ford was driving approximately 40

miles per hour, or traveling 58.67 feet per second. Lawson Dep. 32:3-13; ECF No. 74-1, Faulkner Dep. 70:5-71:6. Ford slammed on his breaks and initiated the emergency break, but his breaks were in poor condition. Compl. ¶ 39. At no time did Ford see Defendant Billie while he was driving toward the roadblock, nor did he accelerate toward the roadblock location. Id. at ¶ 41, ECF No. 74-2, Ford Dep. 32:7-33:8.

Lawson discharged his weapon one time at a tire of Ford's vehicle as it passed him at the roadblock area. Lawson Dep. 34:2-5. Lawson also described the vicinity of Ford's vehicle to him as being "directly parallel" to him when he shot. Id. at 39:1-25. Defendant Billie testified that Ford had "passed Deputy Lawson and [] was accelerating toward [Defendant Billie]." Billie Dep. 44:10-20. Thereafter Defendant Billie ran alongside Lawson's police cruiser, crossed the lane of egress, "hit the embankment . . . [took] a step or two and [fell] into the bank. When [his] knee hit the bank, [he] drew [his] weapon and [he] spun and shot." Id. at 44:10-20, 62:5-65:18; Faulkner Dep. 66:1-69:8. Defendant Billie discharged his firearm twice, shooting through Ford's driver's side window both times, striking Ford in the back twice, each bullet striking at the exact same location on his body, paralyzing him. Compl. at ¶¶ 46-47. Ford crashed his vehicle into a hillside to stop. Id. at ¶ 52.

**MEMORANDUM OPINION AND ORDER
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 73]**

Importantly, Lawson testified that one second of time passed between Lawson's first shot and Defendant Billie's two shots. Lawson Dep. 38:20-25. Further, Lawson testified that he did not see anything in front of Ford's vehicle when he shot at Ford's tire, and that "[j]ust the road [was] there." Id. at 39:18-21. Lawson recalls that when he heard Defendant Billie's shots, Ford's vehicle was "directly parallel to where John Billie was at the time." Id. at 35:1-6. Defendant Billie did not estimate the distance between himself and the road or Ford's vehicle at the time he fired his weapon. Billie Dep. 46:11-15. Ford disputes that his vehicle was moving at the time he was shot. Ford Dep. 33:9-38:4. In fact, Ford testified that he approached the roadblock, began braking, and took off for the pathway created by the roadblock to avoid hitting the police cruisers. Id. at 33:9-38:4. Ford's vehicle came to a stop on "the other side of the roadblock," and then he was shot and paralyzed. Id. at 33:9-38:4.

Ford alleges that the MCSD has a "custom, pattern, practice, and procedure of using unjustified and unreasonable excessive deadly force against individuals who are allegedly fleeing without anyone being in Imminent Danger" as defined by the use of force policy. Compl. at ¶ 54. This policy states, in part: the use of lethal force can be used to prevent the escape of a suspect or prisoner whose freedom is reasonably believed to represent an imminent threat of serious bodily injury or death to the deputy;

8

other law enforcement officers, or others. That policy also prohibits shooting at or from a moving vehicle absent exigent circumstances. ECF No. 71-22, MCSD Use of Force Policy, at section V(c)(2)(g).

MCSD has attempted to justify shooting at three citizens in four separate incidents, including this one, between December 2016 and October 2017 using the same false justification, and was on scene during a fourth shooting involving the City of Fairmont Police Department in 2016. Compl. at ¶ 75. Ford recounts the July 25, 2017, and August 2, 2017, shootings of Philip Jontz Rhoades, and his own shooting on October 17, 2017, as events showing the pattern under Monell. Id. at ¶ 79.

Ford alleges three causes of action in the complaint:

1. Count I: 42 U.S.C. § 1983 - Excessive Use of Force
2. Count II: 42 U.S.C. § 1983 - Monell Liability (County Commission of Marion County)
3. Count III: Intentional Infliction of Emotional Distress

## IV. DISCUSSION

Defendants County Commission of Marion County and John Billie, in his official and individual capacity (collectively referred to herein as "Defendants") move for summary judgment on the following grounds: (1) Ford's claims under 42 U.S.C. 1983 for excessive force should be dismissed as Defendant John Billie ("Defendant Billie") did not use excessive force against Ford, and

instead used reasonable force against Ford; (2) Ford's Monell claims fail to demonstrate a pattern and practice by the Marion County Sheriff's Department of violating Ford's, and others', constitutional rights; (3) Defendant Billie is entitled to qualified immunity from Ford's state law claim of intentional infliction of emotional distress; and (4) Ford's claim for punitive damages must be dismissed. The Court will address each argument in turn.

### A. Count I: 42 U.S.C. § 1983 - Excessive Use of Force

#### 1. Qualified Immunity

Qualified immunity can be afforded to government officials for discretionary acts taken in their official capacity. The protection extends to "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). An officer, generally, is protected by qualified immunity if his "actions could reasonably have been thought consistent with the rights . . . alleged to have [been] violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987). The test to determine whether an officer is entitled to qualified immunity is two-fold: (1) taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right, and (2) was that right clearly established such that a reasonable person would have known? Siegert v. Gilley, 500 U.S. 226, 232 (1991). In determining whether

**MEMORANDUM OPINION AND ORDER**
**DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 73]**

a right is clearly established, the "dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Brosseau v. Haugen, 543 U.S. 194, 198-99 (2004) (citing Anderson, 493 U.S. at 201-202). The Court can address either prong first. Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).


    2.    **Excessive Force**

"[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Tennessee v. Garner, 471 U.S. 1, 7 (1985). "The determination whether a reasonable person in the officer's position would have known that his conduct would violate the right at issue must be made . . . in light of any exigencies of time and circumstances that reasonably may have affected the officer's perceptions." Pritchett v. Alford, 973 F.2d 307, 312-13 (4th Cir. 1992). Under the Fourth Amendment's "reasonableness" analysis, force is not excessive if it is objectively reasonable under the circumstances facing the officer, without regard to his underlying intent. Graham v. Conner, 490 U.S. 386, 397 (1989).

The "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a

particular situation." Id. at 396-97. The Supreme Court has written

the following about the reasonableness of deadly force:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

Garner, 471 U.S. at 11.

Deadly force "may not be used unless necessary to prevent the

escape and the officer has probable cause to believe that the

suspect poses a significant threat of death or serious physical

injury to the officer or others." Id. at 1. This assessment occurs

at the moment that force is used. Elliott v. Leavitt, 99 F.3d 640,

643 (4th Cir. 1996) (writing that "conduct prior to that moment is

not relevant in determining whether an officer used reasonable

force"). The Supreme Court has held that police may not use deadly

force against an unarmed, non-dangerous, fleeing suspect. Id.

Thus, for purposes of qualified immunity analysis, it is clearly

established that using deadly force in such a situation is

unlawful.

Here, in order for the Court to grant summary judgment to

Defendants as to Count I: 42 U.S.C. § 1983 - Excessive Use of

Force, it would need to find as a matter of law that Defendant Billie's conduct was reasonable given the circumstances. Those circumstances, however, are disputed. Viewing the evidence in the light most favorable to the non-movant (Ford), Ford's vehicle was either in front of or immediately adjacent to Defendant Billie when Defendant Billie fired shots at Ford and paralyzed him. At no time has Defendant Billie provided an estimate as to the distance between he or Lawson to Ford's vehicle at the time of either shooting. Billie Dep. 36:1-37:22. It is possible for a reasonable jury to find that such placement of Ford's vehicle and Defendant Billie was possible because Defendant Billie's two gun shots entered Ford's driver side window as Ford's car was passing through a staggered roadblock created by the officers, and struck Ford under his left arm, causing the spinal cord injury that resulted in his paralysis. The vehicle's placement in relation to Defendant Billie when he fired the shots could negate the theory that the vehicle was used as a weapon or posed a threat, which could make Defendant Billie's conduct potentially unreasonable. It is clearly established that, via Tennessee v. Garner and its progeny, an officer's use of deadly force against a non-threatening, non-dangerous individual is an unlawful seizure in violation of the Fourth Amendment.

Defendants rely heavily on Waterman v. Batton, 393 F.3d 471 (4th Cir. 2005). In Waterman, police followed the defendant, Waterman, on a high-speed chase just prior to shooting him. Over radio traffic, one officer reported that Waterman "just tried to run [him] off the road . . . he's trying to take us off the road." Id. at 474. The Court of Appeals for the Fourth Circuit found in Waterman that police officers were entitled to qualified immunity based on Waterman's vehicle's "lurching" toward them, along with other factors, because at the time the vehicle "lurched forward, the officers were forced to immediately decide whether Waterman was attempting to assault the officers ahead of him or whether he intended only to drive by them, leaving them unharmed." Id. at 477. This Court does not disagree that if there was no dispute that Ford's vehicle was lurching toward police, that fact would help to establish qualified immunity for Defendant Billie. However, at summary judgment stage, viewing the facts in the light most favorable to the non-moving party, the Court cannot find the undisputed facts show that the vehicle was moving toward Defendant Billie, or even that Defendant Billie was in the car's trajectory. Instead, the facts presented to the Court include testimony from Lawson that only one second of time passed between Lawson's first shot and Defendant Billie's two shots, and that Lawson did not see anything in front of Ford's vehicle when he shot at Ford's tire,

14

but simply that "[j]ust the road [was] there." Lawson's Dep. 38:20-25-39:18-21.

Defendant Billie's testimony paints a different picture. He recalls that Ford's vehicle had "passed Deputy Lawson and [] was accelerating toward [Defendant Billie]" which essentially required Defendant Billie to cross the lane of egress, "hit the embankment," take "a step or two and [fall] into the bank." Billie Dep. 44:10-20. Thereafter, Defendant Billie drew his weapon, spun, and shot twice. Billie Dep. 44:10-20. Defendants allege this series of events occurred while Ford's vehicle was moving 40 mph, or 58.67 feet per second through the roadblock.

Because this Court cannot "ignore[] discrepancies among the officers' accounts," it must conclude that a reasonable jury could find that Defendant Billie used excessive force. Estate of Jones by Jones v. City of Martinsburg, West Virginia, 961 F.3d 661, 666 (4th Cir. 2020) (internal quotation and citation omitted). Evidence exists that could lead a reasonable jury to find that Ford's vehicle was not moving toward Defendant Billie, and was instead passing him, when Ford was shot. In fact, a reasonable jury could also conclude that Ford's vehicle was not moving at the time he was shot, or was moving slower than 40 mph. Ford Dep. 33:9-38:4, see also Compl. at ¶¶ 46-47 (Ford was shot in the back twice, each bullet striking at the exact same location on his body, paralyzing him).

For those reasons, the Court finds that there is sufficient evidence for a jury to find that Defendant Billie's conduct was objectively unreasonable. While Ford may have been fleeing a police officer, there is a genuine issue of material fact as to whether either Lawson or Defendant Billie were in danger, as the shots fired by Defendant Billie were fired as Ford was passing Defendant Billie or immediately adjacent to Defendant Billie. See Elliott, 99 F.3d at 643 (the assessment of whether the suspect is a threat is made at the moment when force is used); see also Waterman, 393 F.3d at 481 (stating that "events should be reviewed outside the context of the conduct that precipitated the seizure" and that deadly force, even if justified at the beginning of an encounter, can be eliminated "even seconds later" if the threat is eliminated). Defendants suggest that Ford was driving his vehicle at the officers and therefore using his vehicle as a weapon. Because there is evidence that could lead a reasonable jury to conclude that this fact is untrue, the Court finds that a genuine issue of material facts exists and denies the motion for summary judgment as to this claim.

## B. Count II: 42 U.S.C. § 1983 - Monell Liability (County Commission of Marion County)

A municipality is liable under § 1983 if it follows a custom, policy, or practice by which local officials violate a plaintiff's constitutional rights. Monell v. Dep't of Social Servs. of City of

MEMORANDUM OPINION AND ORDER
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 73]

New York, 436 U.S. 658, 694 (1978). "[T]he substantive requirements for establishing municipal liability for police misconduct are stringent indeed. The critical Supreme Court decisions have imposed this stringency in a deliberate effort to avoid the indirect or inadvertent imposition of forms of vicarious liability rejected in Monell." Spell v. McDaniel, 824 F.2d 1380, 1391 (4th Cir. 1987). Courts have required plaintiffs to demonstrate "persistent and widespread . . . practices of [municipal] officials," along with the "duration and frequency" – which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their "deliberate indifference." Spell, 824 F.2d at 1386-91. Sporadic or isolated violations of rights will not give rise to Monell liability; only "widespread or flagrant" violations will. Owens v. Baltimore City State's Attorneys Office, 767 F.3d 379, 402-03 (4th Cir. 2014) (citing Spell, 824 F.2d at 1387).

Municipal liability results only when policy or custom is "(1) fairly attributable to the municipality as its 'own,' and is (2) the 'moving force' behind the particular constitutional violation." Spell, 924 F.2d at 1386-87 (citations omitted). "Custom and usage" require a showing that the "duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." Id. at 1387.

17

MEMORANDUM OPINION AND ORDER
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 73]

The actual knowledge can be established by reports or discussions. Id. Constructive knowledge may be shown by the practices being "so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of them." Id. In other words, the "deliberate indifference" standard under Spell requires that a municipality either knew or should have known about the deficiency, so it could remedy that deficiency. Estate of Jones by Jones v. City of Martinsburg, West Virginia, 961 F.3d 661, 672 (4th Cir. 2020). Such a developed "custom or usage" may then become the basis of municipal liability, but only if its continued existence can be laid to the fault of municipal policymakers, and a sufficient causal connection between the "municipal custom and usage" and the specific violation can then be established. Id. at 1390.

In Carter v. Morris, 164 F.3d 215 (4th Cir. 1999), the plaintiff brought suit against the Danville Police Department. The Fourth Circuit found that the plaintiff's allegations were insufficient to establish Monell liability. The court boiled down plaintiff's cited incidents to two instances — in addition to the instance at issue in the case — of "even arguably unlawful arrests" or unreasonable searches and seizures by the Danville Police Department. Id. at 219. The court referred to this evidence as a "meager history of isolated incidents" that does not reach the required "widespread and permanent" practice necessary to

18

establish a municipal custom. Id. at 220. The court also noted that the plaintiff showed no relevant incident prior to her own case of which the City could have had knowledge and could have acquiesced. Id.

However, Courts have also held that Monell liability can attach to municipalities when the policy and custom is based upon a single incident. See Pembaur v. City of Cincinnati, 475 U.S. 469 (1986). The Court was presented with the following question: "[w]hether, and in what circumstances, a decision by municipal policymakers on a single occasion may satisfy this requirement," to which it answered:

> [I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy.

Id. at 471, 480.

Here, Ford has not alleged that the MCSD has promulgated any formal unconstitutional policy. Instead, Ford argues that the MCSD "has a custom, pattern, practice, and/or procedure of using Excessive Force against individuals who are allegedly fleeing without anyone being in Imminent Danger . . . and without the existence of exigent circumstances." Compl. at ¶ 74. Ford claims

that the MCSD has a custom, pattern, practice, and procedure of falsely claiming an imminent threat exists in order to justify the unlawful uses of excessive force. Id. ¶¶ 74-75. Ford points to four (4) total shootings in support of attaching Monell liability to Defendant County Commission of Marion County: (1) July 25, 2017 shooting by Deputy Love at Philip Jontz Rhoades; (2) August 2, 2017 shooting by Deputy Forsyth at Philip Jontz Rhoades, killing him; (3) the instant October 17, 2017, shooting by Defendant Billie at Ford, paralyzing him; and (4) a 2016 shooting involving the City of Fairmont Police Department at which the MCSD was present.[1] Id. ¶¶ 75-79.

Defendant County Commission of Marion County ("County Commission") argues that Ford's Monell claim fails as there has been no violation of any constitutional rights and there has been no evidence presented by which a reasonable juror could find the County Commission had a custom of violating constitutional rights. The County Commission further argues that the four (4) alleged incidents are too few to rise to the level of "persistent and widespread" as required by Monell.

The Court disagrees with the County Commission: Here, Ford has set forth a satisfactory custom or a persistent and widespread

---

[1] According to the Defendants' Motion, the 2016 shooting occurred in December and involved Randy Cumberledge, who was killed. ECF No. 74, p. 25.

practice that a reasonable juror could conclude violated Ford's rights. Again, "widespread" or "flagrant" violations can sustain a <u>Monell</u> claim. <u>See</u> <u>Owens</u>, 767 F.3d at 402-03. Taken in the light most favorable to the non-movant, these violations could be considered flagrant. The temporal proximity – all occurring over the span of 11-weeks – as well as the significance of the events including the fatal shooting of August 2, 2017 counsel in favor of this conclusion particularly at summary judgment stage. In his Response, Ford relies on the following events to support the <u>Monell</u> claim:

- The shooting during a July 25, 2017 pursuit (MCSD police fired shots at Philip Jontz Rhoades and missed) (the "July 25 Shooting");

- The shooting on August 2, 2017 (MCSD police fired shots at Philip Jontz Rhoades and killed him) (the "August 2 Shooting");

- The shooting at Ford's moving vehicle as it transgressed the staggered roadblock on October 17, 2017 (MCSD police fired one shot at Ford and missed); and

- The shooting at Ford's moving vehicle as it transgressed the staggered roadblock on October 17, 2017 (MCSD police fired two shots at Ford through his driver's side window, both gun shots entering his left side of his body, resulting in paralysis). ECF No. 96.

Ford has met the stringent requirements of a <u>Monell</u> claim to survive the Defendants' Motion for Summary Judgment. Importantly,

MEMORANDUM OPINION AND ORDER
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 73]

the alleged policy or custom must be the "moving force" behind the
constitutional violation at issue. Also importantly, the
deliberate indifference standard implicated here requires that a
municipality either knew or should have known about the deficiency,
so it could remedy that deficiency. See Estate of Jones by Jones
v. City of Martinsburg, West Virginia, 961 F.3d 661, 672 (4th Cir.
2020). The Court finds, under the facts presented in the record
before the Court, that a reasonable juror could find that the
pattern pleaded by Ford in this case shows that the County
Commission knew or should have known that such deficiency existed.

Ford argues that the first two incidents, the July 25 Shooting
and the August 2 Shooting, prove the existence of a policy or
custom. A reasonable jury could conclude that two incidents
involving the same person — Philip Rhoades — is enough to support
a "widespread and permanent" practice by a municipality,
especially because a single occasion may satisfy this requirement.
Further, while it has not been adjudicated that Rhoades's
constitutional rights were violated during the July 25 Shooting,
much less violated in the same manner as Ford's were, allegedly,
here, the instant matter is scheduled for trial merely one week
after the Rhoades trial is set to begin. A reasonable jury could
contribute the shootings at Ford by Lawson on October 17, 2017,
and by Defendant Billie on October 17, 2017, to a persistent and
widespread practice under Monell. A reasonable jury could also

**MEMORANDUM OPINION AND ORDER**
**DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 73]**

contribute the shootings at Rhoades by MCSD police on July 25, 2017 and August 2, 2017, to a persistent and widespread practice under <u>Monell</u> once the claims are adjudicated. Again, the circumstances in the Rhoades incident should not be overlooked. Considering those in the light most favorable to Ford, the significance of the August 2, 2017 fatal shooting is certainly of a level that it stretches beyond common sense the notion that County Commission policy makers were unaware of the incident and its potential violation of policy. The Court, therefore, denies the Defendants' Motion for Summary Judgment as to Count Two.

**C. Remaining Claims**

For the same reasons the Court denies Defendants' Motion for Summary Judgment as to Count One, the Court denies the Motion for Summary Judgment as to Count Three (Intentional Infliction of Emotional Distress) as it pertains to Defendant Billie. Finally, the Court denies without prejudice the Motion for Summary Judgment on the issue of punitive damages.

**V. <u>CONCLUSION</u>**

For the reasons discussed above, the Court **ORDERS** the following. Defendant's Motion for Summary Judgment is

        (1) **DENIED** as to Count I;

        (2) **DENIED** as to Count II;

        (3) **DENIED** as to Count III;

(4)   **DENIED WITHOUT PREJUDICE** as to punitive
      damages.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to

counsel of record.

DATED: April 8, 2021

                              /s/ Thomas S. Kleeh
                              THOMAS S. KLEEH
                              UNITED STATES DISTRICT JUDGE